IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| v. | : | Docket No.: 1:18CR00330 |
| | : | The Honorable T.S. Ellis, III |
| LOGAN McCAULEY | : | |

## RESPONSE TO MOTION FOR RESTITUTION

I.  Procedural Background

Logan McCauley, by and through counsel, hereby replies to the Government's motion.

The verdict in this case was returned on February 1, 2019. The government had over 70 days to prepare for any restitution issues prior to sentencing on April 26, 2019.

Nevertheless, on the morning of April 26, the government told the Court it wanted more time to come up with restitution. The Court graciously gave the government until May 17, 2019 to address this simple issue. The government then told the Court prior to the May 17, 2019 hearing that it again needed more time. Over our objection, the hearing was continued until July 19, 2019. The July 19, 2019 date was five and one half months removed from the February 1, 2019 verdict date. Defense counsel—defending a special education young man with a potential traumatic brain injury in a jury trial facing a 15 year mandatory minimum

—was given four and a half months from arraignment to trial. The government repeatedly objected to any additional preparation time for the trial while espousing its view that this was a simple case. In fact, when counsel asked for time to have a scan and other tests performed for this young man—who tested in the .1 percentile on some cognitive testing—the defense was granted only two additional weeks as a result of the government's continued assertions about the simplicity of the matter. The tests could not be completed.

With the July 19, 2019 date approaching, the government asked this Court to appoint a guardian for N.C. in order to "marshal" the records. The Court appointed a guardian though it appears N.C. has family completely capable of getting records and providing them to the Court.

The guardian then wrote a letter to this Court ("via" the U.S. Attorney's office and not copied to defense counsel) stating N.C. was not undergoing any mental health treatment at all. So, it appeared there were no records to marshal. It seemed that N.C. incurred nothing out of pocket for any initial costs and has no costs since that time.

Curiously, the guardian also wrote that the lack of counseling was due to the family's financial condition—a statement flatly contradicted by the findings of the probation officer as the family represented it was fully covered by insurance.

The United States then asked for yet another extension and, over objection, was given until August 23, 2019. There is, of course, a 90 day limit on these issues after sentencing. At the August 23, 2019 hearing, the Court then gave the government additional time—until September 4, 2019 to file a pleading. We now respond to the incredible amounts in the prosecution pleading.

II. Factual Background

It is clear from the record in this case that N.C. had substantial behavioral and other issues long before she urged McCauley to pick her up. She solicited McCauley because of these issues and now the government wants him to pay for her already existing issues. McCauley is not responsible for any mental health or other counseling not specifically established and caused by his own conduct. N.C. clearly had issues with her family and her inability to tell the truth along with other behavioral issues long **before** her conduct with McCauley. McCauley should not pay for services related to her own family or personal issues. The letters recently submitted admit that N.C. had many already existing issues. It is curious and unfortunate that the letters writers have not had the benefit of actually reviewing the prosecution's discovery—though the Court has now finally had an opportunity to review some of the discovery.

Perhaps the guardian and the letter writers do not understand the genesis of this case, but the Court is extremely familiar with the factual background. Those facts are critical. The record is quite clear that N.C. had significant issues prior to any interaction with McCauley. She was extremely skilled at manipulating her identity and her actions online and in person were plainly deceitful. This was particularly true in her online interactions with Logan, a young man with special needs and limited intelligence.

It was on one such online video streaming platforms- Live.me- that Logan came to know "Kayla Washington" a self-described 21 to 22-year old divorcee-turned stripper with two kids, a predilection for smoking marijuana and drinking beer, and a probation officer supervising her after her convictions for unidentified crimes. Kayla's claimed her mother resides with Kayla and Kayla's two children because Kayla's mother is financially unable to support herself and relies on Kayla's erotic dancing career to support the household. The Court can now finally see the extent of her mental illness, hyper-sexuality, and behavioral issues.

Live.me is a live streaming video platform that allows users to show the world a live video stream of what they are up to at any given moment. It can be accessed from a smart phone, computer tablet or traditional computer and allows users to beam their antics into cyberspace 24 hours a day, 7 days a week, to an unlimited number of viewers.

The site also allows users to "chat" with one another by sending each other typed communications, in much the same way people "text" each other via cell phones.

Prior to streaming your activities to the voyeuristic world, Live.me requires users to register. Kayla Washington's Live.me username was "babysmama." The Court reviewed the profile at issue here as part of our pretrial motions in our Under Seal pleading. The lies and deceit contained in this profile existed long before Logan McCauley had any interaction with N.C. aka Kayla.

According to Live.me, Kayla had well over 5000 registered "viewers" of her Live.me channel with whom she regularly chatted and interacted.

Logan was a constant user of Live.me and, the two met online. Once introduced, they exchanged phone numbers and "chatted" frequently on Live.me while Kayla video streamed herself to the world.

The evidence at trial revealed Logan and Kayla would also sometimes chat with each other via "Snapchat". "Snapchat", in its most basic form, is a free mobile messaging application. Similar to Live.me, the site requires registering users to supply a suggested username, a suggested password, an email address, a date of birth and a phone number. Kayla Washington's Snapchat username was "mysondarren", in reference to one of her two children. Of course, this was fiction.

Beginning in the middle of November 2017, Logan and Kayla were communicating frequently, often multiple times a day. Logan saved Kayla's contact information in his cell phone under the name "my best bae", "bae" being a slang term of endearment used in connection with one's romantic love interest.  In his email contacts, Logan likewise saved Kayla's contact info as "My best babe for life", along with an image of a diamond engagement ring.  All of this evidence was referenced either at trial or in our extensive pretrial motions hearing.

Kayla, as indicated above, repeatedly professed her love for him and referred to Logan as her "bae".

Unbeknownst to Logan, however, "Kayla Washington" was not a 20+ year old stripper mother of 2 but instead was the organized and well-orchestrated fictional creation of "N.C.", the juvenile with whom Logan made the single 19 second iPhone video that was the focus of the child pornography production charge in this case. N.C's creation of the fictional "Kayla Washington" was neither impulsive nor haphazard.  Rather, as the Court saw at trial and during pretrial motions (and now in the defense exhibits), it was the product of thought and effort and based on research, as indicated by N.C's recovered internet searches on topics such as "Pranking people on Live.me";  "How to make people believe your (sic) are 21 when you are actually 14"; and "What year were you born in if you are 21".

"N.C." also has breadth of information and experience in online pornography and sexuality, as indicated by N.C's recovered internet searches on various sexual topics specifically referenced in our pretrial motions and included in our exhibits.

By late November 2017, "N.C" had perfected her "Kayla Washington" alter ego by live streaming more than 67 hours of her "Kayla Washington" persona to her 5000+ fans and by chatting online with any number of adult males, trying to persuade them to pick her up, engage in sexual relations, and other assorted and sundry erotic interactions.  Clearly, Mr. McCauley should not pay for the emotional and problematic behavioral issues N.C. had long before their interaction in November of 2017.

As the government argued at trial, Logan did in fact drive to West Virginia to pick up Kayla in the early morning hours of November 27, 2017.  The impetus for, and explanation of, that trip to West Virginia is set forth in a chat record beginning in the evening of November 26, 2017.  The *entirety* of that chat was attached to our pretrial Under Seal pleading and is incorporated here by reference.

At around 5:30pm on November 26, 2017, Kayla sent Logan the following message "Hey bae can. U come get me tonight".

Logan responded 15 minutes later: "I cant baby i dont have money to get there or anything".

At 5:58, Kayla suggested the following: "See if you can get a ride babe you can come here".

Logan responded a minute later with: "No one will".

At 6:13, after Logan told Kayla that he was at work, Kayla wrote: "Does anyone there will help u out"

When Logan told her that no one will help him out, Kayla variously pleaded with him "Cmon" "Cmon"; "borrow money";and "get a friend to help you".

After Logan again (and again) told Kayla that he could not come to get her, Kayla responded at 6:19 with: "I am going to die to night" and told Logan at 6:25 that her mother "will kill me if I don't get out to night".

It is only at this point- and only for this purpose- that Logan drove to West Virginia. Logan drives to West Virginia in order to rescue his girlfriend from a situation in which she feels threatened and unsafe. Logan then asks Kayla for her address (which he does not have); tells her he loves her; lies to his mother in order to secure the necessary gas money (he has none); and drives 3:30 hours to pick her up.

After Logan picked her up, the two of them live streamed their drive back to Logan's mother's house, for all the world to see.

Over the course of the next two days, Kayla openly stayed with Logan and his mother Jennifer, even as Logan went to work.  As the Court saw in our pretrial

pleadings and as we can all see in our exhibits: Logan and Kayla also took many photos of themselves together, most of which were non-explicit in nature. For instance, Logan took pictures of Kayla in his house, and she took pictures of him playing with his dog and sitting in a chair. Logan also brought her to his part-time job at Advanced Auto Parts and introduced her to his co-workers as his girlfriend Kayla. Logan, Jennifer and Kayla even discussed the possibility of Kayla living with the McCauleys on a permanent basis. There is simply no emotional or physical harm that needs to be addressed via restitution regarding Logan's conduct.

Logan and Kayla engaged in sexual intercourse 4 times over the two-day period and it was in the middle of one of the last of those instances that Logan took the single 19 second video at issue. On the morning of the video, the two of them woke up, smiled at each other and the camera, and kissed. As Logan told the police, while they were in the midst of sexual intercourse, he "grabbed" his phone and took the video with Kayla's knowledge. Logan later told a friend what occurred and that "we ended up making a video".

On November 28th, while Logan was at work and Kayla was at the McCauley home, Kayla texted Logan that she loved him and that "I text me mom and said I will kill her if u call the cops and I am watching u I text her that on Facebook lol I want to see what she said". Logan then told her to "behave."

A little while later, Logan texted Kayla that he would never leave her, to which Kayla responded "I won't at all and if I did I would not want a kid okay and I will never leave u bc u are the best I love u for what u do and what u are and I want a kid bc I know u will happy and I will to". Logan responded at 9:30am: "Baby you mean the world to me i love you so much that made my day cuz i feel like shit im in and out of the bathroom".

Logan and Kayla then spent the rest of the day intermittently expressing how much they missed each other and how much they loved each other.  She, quite simply, duped a mentally challenged kid and now the government wants restitution on top of their utterly indefensible decision to seek 15 years in prison.

Later in the day on November 28, 2017, Detective Orr with the Loudoun County Sheriff's Office arrived at the McCauley home after tracking down the IP address from which Kayla sent a threatening Facebook threat to her mother. Detective Orr made contact Logan, Logan's mother and a female identifying herself as a 22 year-old woman named "Kayla Washington". When Detective Orr told the gathered group that he was looking for a juvenile named "N.C.",  Kayla told Detective Orr that she knew "N.C" and that she (Kayla) allowed "N.C." to access her Facebook account but that "N.C. was not at the house.  Kayla then showed Detective Orr around the McCauley house to demonstrate that "N.C." was not present in the house.  Finding no one else in the home, Orr contacted an FBI

agent in West Virginia and advised him that the only female on site was named Kayla Washington. According to Orr's report, the West Virginia agent then "advised that 'N.C.' will use that name and has died (sic) her hair before to conceal her identity." Detective Orr then sent a photo of Kayla to the West Virginia agent who confirmed it was "N.C." posing as Kayla Washington. "N.C." was then taken away by police.

When Orr explained that N.C. was 13 and not a 21-year old woman named Kayla Washington, both Logan and his mother were dumbfounded. Logan, for his part, began to cry.

As noted at trial, Logan consistently agreed to be interviewed by the detectives and admitted to having sexual intercourse with Kayla. Logan also acknowledged that he had he received a message via Facebook indicating that Kayla was a missing 13-year-old girl. Logan told Orr that he asked Kayla about it and she told him her mother was crazy and was lying to get her back.

At the conclusion of the interview, Detective Orr did not arrest Logan, instead telling him that he (Orr) would be in touch about what would happen next. It was only as Detective Orr was leaving the McCauley home at the conclusion of his interviews that Logan voluntarily told the detective about the 19 second iPhone video at issue in this case. Orr had not asked for any video—Logan simply volunteered its existence. Logan then unlocked his phone, pointed out the video,

and provided the entire phone to the police. Detective Orr viewed the video, seized the phone and again told Logan that he would be in touch about what would happen next. The detective then left, leaving Logan at home with his mother.

Logan called Detective Orr the very next day in order to tell him that he had a necklace that belonged to "Kayla". Detective Orr and Agent DiMauro met with Logan in the afternoon at Advanced Auto Parts and interviewed him again, surreptitiously recording their encounter while collecting the necklace. Logan spoke freely with Detective Orr and, in response to his questions, reiterated that neither he nor his mother knew or suspected that "Kayla Washington" was not who she claimed to be. At the conclusion of the interview, Logan voluntarily offered to come the station the next day to provide the detectives with yet another statement, if they so wished. Detective Orr told Logan that it was not necessary.

As for "N.C", she continued to insist she to law enforcement that she was Kayla Washington and not some missing girl named "N.C.". In an interview with two FBI agents, a Loudoun County detective and a victim witness specialist that lasted well over two hours, "N.C." never once budged from her story, insisting that she was born in 1996, had just returned from a visit to the United Kingdom and had recently suffered a miscarriage- the same sorts of lies she told Logan and his mother. She also stated that she intended to return to Logan when she was released. Her interview is included in our exhibits.

As noted above, there are several pieces of evidence supporting our position at the restitution hearing that McCauley should not be responsible for any restitution. He should not be responsible for counseling or any services N.C. needs because of behavioral or mental health issues that are clearly separate and apart from McCauley. She has a host of issues and while the government has jumped up and down to prevent this Court of the Court of Appeals from viewing N.C. as she actually presented herself along with the actual evidence of her prior issues, whether or not N.C. has behavioral or mental health issues pre-dating her interaction with McCauley is plainly relevant to the case and this restitution hearing. Accordingly, we finally were able to force the government to produce to the Court the defense exhibits (most of which were in the exclusive possession of the United States) as relevant to this issue:

There are over 70 hours of Live me Videos produced by N.C. We believe the following are relevant as to her behavioral and mental health issues prior to any involvement with McCauley. All of these videos show her misrepresentations, her alcohol use, and various behavioral problems unrelated and prior to McCauley.

These were all in the exclusive possession of the prosecution and some have now been turned over to the Court for review Under Seal. The videos are:

1. Part II, 10th Video minutes 27:00-31:15
2. Part III, 8th Video minutes 16:50-18:30
3. Part III, 11th Video minutes 17:00-17:45

4. Part I, 2nd Video minutes 2:00-2:20
5. Part II, 9th Video minutes 10:45-11:30
6. Part II, 9th Video minutes14:00-15:00
7. Part II, 2nd Video (36:00 to 38:00)

We also proffer to the Court N.C.'s Live me Profile (previously filed with the Court as part of our pretrial motions package) and the entire chat between N.C. and McCauley (also part of our pretrial motions package).  Both of these show N.C.'s misrepresentations to both the world and to McCauley specifically and demonstrate her mental instability long before her interaction with McCauley.

Finally, we presented as exhibits the following.  All of these demonstrate pre-existing issues and were in the sole possession of the United States.  They should have now been submitted to the Court under seal by the prosecution.

> Chats between N.C. and other men.  These chats were saved to her iPOD are identified by the following numbers: 130, 131, 137, 153 and 128.

> Searches on N.C iPod for "Pranking people on Live me", "How to make people believe your 21 when your actually14." "what year were you born in if you are 21".

These are all reflective of a troubled young individual—McCauley should not be held responsible for payment to address these issues.  They must be resolved by N.C. and her family.

   III.   Argument

We, of course incorporate our prior objections as to the timeliness of this motion. The 90 day statutory limit is a distant memory.  We also incorporate all of our previous arguments in our pleadings and in court.

The letters submitted by the treatment providers actually support the defense argument. The letter writers state that N.C. had a history of "running away" a pattern of "sexually inappropriate behaviors" and "difficulty in making healthy decisions." These all existed PRIOR to her fooling McCauley into picking her up that night. Indeed, the writers note that N.C. has an extensive history of trauma long before the video here.

The Court can now see for itself the depth of the behavioral issues. We have lies about age, lies about being an erotic dancer, lies about her family, lies to Logan about her impending death if he did not pick her up, alcohol abuse, chats with other men she was attempting to solicit and a bevy of other facts all supporting our contention.

Quite simply, she does not have these problems because of Logan— she got Logan to get her because of these problems.

In *Paroline v. United States*, 572 U.S. 434 (2014), the Court held the government must prove any loss was proximately caused by the accused. The Court made clear that proximate cause requires two things. First a former event **caused** the later. This is quite commonly known as cause in fact. Then, secondly there must be proximate cause and connection. *See Paroline* at 448.

Importantly, the Court also held that the restitution is only proper to address the defendant's own conduct--not the conduct of others. *Id.* Finally, *Paroline* examined the issue of amount and looked at whether there was trafficking (there is none here), and whether any image was viewed by others (none here). In fact, the case at bar involves one 19 second video that nobody viewed (not even McCauley) until McCauley turned the video into the police. The video existed for about a day before it was voluntarily turned into the police. The video is the offense of conviction.

Despite an enormously long continuance of over seven months, the submissions presented by the government simply don't meet the burden set forth in *Paroline* especially in light of the substantial evidence presented in the defense exhibits. N.C. has long standing mental health and behavioral issues, but these rest in her family dynamics and own issues, not with Logan. There is no cause in fact, no proximate cause as those terms are set forth in *Paroline*.

Finally, in terms of a further hearing in this matter, we respectfully submit the law is starting to change in this regard. At least two Justices have recently dissented from denials of Certiorari and have urged these matters should be decided by a jury under *Apprendi* and its progeny. We

recognize the current state of the law, but the landscape changes as time moves on and old ideas—such as the constitutionality of the Sentencing Guidelines—begin to erode. Accordingly, we formally ask for a jury trial on these issues to preserve this issue in the unlikely event the Court grants any restitution. If the Court is unwilling to grant a jury trial, then the matter seems ripe for decision on the pleadings.

In sum, the 90 day limit has expired. There is no causation. There is no proximate cause. We ask the Court to carefully review our exhibits and deny the government's motion for restitution.

Logan McCauley

By Counsel

_____/s_____
Frank Salvato
1203 Duke Street
Alexandria, Virginia 22314
Bar No. 30453
703-548-5000
Frank@Salvatolaw.com

Certificate

I hereby certify this pleading was filed with the Court's ECF system and notice of such filing will be sent to the Office of the U.S. Attorney, 2100 Jamieson Avenue, Alexandria, Virginia on this 11th day of September, 2019.

_____/s_____
Frank Salvato
1203 Duke Street
Alexandria, Virginia 22314
Bar No. 30453
703-548-5000
Frank@Salvatolaw.com